# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **RUSSELL LOUVIERE, SR.** | * | **CIVIL ACTION NO. 08-0585** |
| **VERSUS** | * | **JUDGE MELANCON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). Therefore, it is recommended that the Commissioner's decision be **AFFIRMED**.

### *Background and Procedural History*

Russell Louviere, Sr., born August 6, 1953, filed applications for a period of disability, disability insurance benefits, and supplemental security income payments on June 26, 2002, alleging disability as of June 13, 2002, due to back problems and open heart surgery. The applications were denied initially. A request for a hearing before an Administrative Law Judge ("ALJ") was timely filed, and a hearing was held on August 12, 2003. (Tr. 433-444). Claimant, represented by attorney William Ziegler, appeared and testified.

On November 24, 2003, an unfavorable decision was issued by the ALJ. (Tr. 265-277). Claimant sought review of that decision in the Appeals Council, which remanded the case for another hearing and decision because the recording of the hearing was inaudible. Another hearing was held, and a second unfavorable decision was issued on June 23, 2005. (Tr. 11-16). Appeal was again taken by claimant to the Appeals Council, which denied review.

Suit was then filed in this Court seeking a remand. By Order of this Court on January 23, 2007, the ALJ's decision was vacated, and the case was remanded with instructions for further action, including another hearing. (Tr. 465-479). Another hearing was held on November 1, 2007, and another unfavorable decision was issued on February 20, 2008. (Tr. 455-464).

Due to claimant's work history, he remained insured for disability insurance benefits through December, 2004. (Tr. 49, 308).

### *Standard of Review*

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with the relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal

standards.  *Singletary v. Bowen*, 798 F.2d 818 (5th Cir.1986).[1]  While substantial evidence lies

somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Muse*

*v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991).

## Analysis of Impairments

To be entitled to benefits under the Social Security Act, claimant must prove that he is

disabled according to the specifications of the Act.  *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th

Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability

under the Social Security Act is "the inability to engage in any substantial gainful activity by

reason of any medically-determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(a); *Anthony v. Sullivan*, 954 F.2d at 292.

In determining whether a claimant is capable of performing substantial gainful activity,

the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f)

(1992).[2]  At step one, the ALJ determined that claimant had not engaged in substantial gainful

_____

[1] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion. *Carey*, 230 F.3d at 136; *Anthony*, 954 F.2d at 292; *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir.
1991).  The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the
Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion.  *Carey*,
230 F.3d at 136; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  A finding of no substantial evidence is
appropriate only if no credible evidentiary choices or medical findings exist to support the decision.  *Johnson*, 864
F.2d at 343.

[2] The procedure is as follows:
1.  If a person is engaged in substantial gainful activity, he will not be found disabled regardless of medical
    findings.
2.  A person who does not have a "severe impairment" will not be found to be disabled.
3.  A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be
    considered disabled without consideration of vocational factors.
4.  If a person can still perform his past work, he is not disabled.

activity since June 13, 2002. (Tr. 449). At step two, the ALJ determined that claimant's combination of lumbar spine problems and valve replacement residual effects was severe. At step three, the ALJ found that claimant's combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1.

The ALJ found that claimant had the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally; to stand and walk two hours at a time, for no more than a total of six hours in an eight-hour day; and to perform frequent stooping, kneeling, bending, squatting, balancing, crouching, crawling, and climbing. (Tr. 452).

At step four, the ALJ found that claimant was able to return to his past relevant work as a cashier/checker and a security guard. (Tr. 452). Thus, the ALJ found that claimant not disabled.

### Assignment of Errors

Claimant alleges the following errors:[3]

I.      The ALJ erred in failing to accord proper weight to the opinions of his own consulting physicians, relying instead upon the testimony of the non-examining medical expert. This resulted in an erroneous assessment of claimant's residual functional capacity.

II.     The ALJ erred in failing to find claimant disabled, pursuant to Rule 201.10.

### Administrative Record

I.      **Medical Evidence**[4]

---

5.    If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

[3] *See* claimant's brief. [rec. doc. 8, p. 4].

[4]All medical evidence reviewed in connection with this Court's earlier decision regarding claimant's application is incorporated herein by reference and has been fully considered for this Report and Recommendation.

**A.  Records from Lafayette General Medical Center and LSU Health Sciences Center Medical Center at New Orleans dated October 10, 2001 to November 7, 2001**.  On October 10, 2001, claimant was admitted with chest pain with complaints of periodic episodes of angina[5] and several syncopal[6] episodes.  (Tr. 110, 118).  Cardiac catheterization revealed a critical aortic valve area of 0.5 cm square, and coronary artery disease which was minor in the diagonal branch and more significant in the circumflex branch, and surgery was recommended in New Orleans.  (Tr. 116).  The diagnosis was critical aortic stenosis and minimal coronary artery disease.  (Tr. 111, 114, 118).  On November 2, 2001, he underwent aortic valve replacement.  (Tr. 118).   He was discharged on November 7, 2001, with no complications.

**B.  Records from St. Martin Hospital dated October 10, 2001 to June 27, 2002**.  On October 10, 2001, claimant was admitted to the emergency room with angina.  (Tr. 181).  On March 24, 2002, claimant was admitted to the emergency room with chest pain, shortness of breath, and weakness.  (Tr. 162).  Examination revealed that claimant's lung fields were clear. (Tr. 170).   The assessment was chest pain.  (Tr. 164).

On June 17, 2002, claimant presented with shortness of breath.  (Tr. 152).  He was smoking one-half pack a day.  He was prescribed medications, and he was advised to stop smoking.  (Tr. 153, 160).

**C.  Records from University Medical Center ("UMC") dated December 9, 1998 to August 20, 2002**.  On December 9, 1998, claimant complained of low back pain radiating to the right leg with numbness and tingling, and weakness to the right arm with pain and numbness.

---

[5]Angina is chest pain due to an inadequate supply of oxygen to the heart muscle.  *www.medicinenet.com.*

[6]A syncopal episode is fainting.  *www.medicinenet.com.*

(Tr. 229). X-rays of the lumbar spine showed changes related to degenerative disc disease. (Tr. 228). The impression was low back pain with no neurologic findings. (Tr. 227).

On December 13, 2001, and on January 31, 2002, claimant complained of bilateral chest pain. (Tr. 213, 217). He was still smoking. He was instructed to stop smoking. (Tr. 213).

On February 28, 2002, Dr. Suresh P. Jain wrote that claimant could return to work, but he could not do heavy weight lifting. (Tr. 212). He was still taking Coumadin. (Tr. 203, 208).

On May 15, 2002, claimant complained of chest discomfort and intermittent left arm pain. (Tr. 206). He complained of shortness of breath on July 3. (Tr. 196). Chest x-rays showed no abnormal findings. (Tr. 197).

On July 5, 2002, an echocardiographic report showed low normal function in the left ventricle, normal mitral valve, normal left atrium, normal aortic root, sclerotic aortic valve, normal right atrium and ventricle, and trace aortic insufficiency. (Tr. 195). The ejection fraction was 55%.

On August 13, 2002, claimant complained of back pain, nervousness, and anxiety. (Tr. 186). The assessment was back pain. Progress notes indicated that his Coumadin dose has been reduced. (Tr. 184). Elavil was prescribed for anxiety. (Tr. 186).

**D. Report from Dr. Debra Durham (internal medicine) dated August 28, 2002**. Dr. Durham evaluated claimant on June 2, 2002, regarding his aortic valve replacement. (Tr. 230). He was attempting to return to work, but even minor exertion had resulted in severe shortness of breath. On examination, he had a loud click on cardiac auscultation associated with a soft pansystolic murmur. He had no edema, and his chest exam was unremarkable.

Because of claimant's dyspnea,[7] Dr. Durham referred him to a cardiologist at UMC. She started him on Enalapril, and she advised him to stay off of work for at least ten days while adjusting his medications. Dr. Durham stated that his long-term prognosis would depend on the etiology of his dyspnea. Her clinical suspicion was that he would be permanently disabled from his previous occupation due to his cardiac disease.[8]

**E. Consultative Examination by Dr. Leone Elliott dated October 19, 2002**. Claimant complained of mid-back pain with some occasional leg weakness, shortness of breath that was worse with activity, and occipital headaches lasting a few hours each time. (Tr. 232). He stated that he could dress himself, but occasionally needed help with his pants and boots. He could stand for 20 to 30 minutes at a time, and walk for 3 to 4 hours for a total of 8 hours. He could walk about 5 minutes, and sit for 15 to 20 minutes. He could lift about 5 pounds, and drive for about 15 to 20 minutes. He did not do any household chores.

On examination, claimant was 67 inches tall and weighed 181 pounds. (Tr. 233). His blood pressure was 149/91. He ambulated well, and got on and off of the exam table and up and out of the chair without any problems.

Claimant's lungs were clear with bronchial breath sounds on his chest. His heart had regular rate and rhythm, with 2/6 systolic ejection murmur. He also had an abnormal snap consistent with the mechanical valve.

On spine and extremities examination, claimant had palpable DP pulses. He had no edema, cyanosis, or clubbing. His gait was normal with no assistive device required. Grip was

---

[7]Difficult or labored breathing; shortness of breath. *www.medicinenet.com.*

[8]Which of claimant's occupations Dr. Durham's report refers to is not specified.

5/5.  Fine and gross manipulation and finger to thumb test were normal.

_____Range of motion of the elbows, forearms, wrists, and shoulders was normal.  (Tr. 234).
Cervical spine examination was normal.  Lumbar spine flexion was slightly limited at 75 to 80
degrees, and lateral flexion was normal.

Examination of the hips, knees, and ankles was normal.  Claimant laid straight back on
the exam table.  Straight leg raising test was slightly limited at 80 and 35 degrees.  He walked on
his heels and tip toes "okay."  He performed the heel to toe test appropriately.

Lumbar x-rays showed normal alignment with mild degenerative joint disease.  Claimant
also had some increased opacity in the L5-S1 region, probably consistent with a possible fusion
he had in the past.

Dr. Elliott noted slight limitations on straight leg raising test with slight limited lumbar
flexion.  He noticed some mild shortness of breath during examination.  Overall, he noted no
limitations of lifting, sitting, standing, or handling objects.  He perceived some limitations of
prolonged walking, especially with claimant's shortness of breath.

**F.  Records from UMC dated September 10, 2002 to April 1, 2005**. On October 25,
2002, claimant was seen for follow-up of aortic valve replacement.  (Tr. 257).  He had no
complaints of shortness of breath or chest pains.  On November 12, 2002, he complained of
headaches and back pain.  (Tr. 256).

On January 17, 2003, claimant complained of shortness of breath on exertion and
numbness in the left thigh.  (Tr. 253).  Chest x-rays showed no evidence of active disease.  (Tr.
249).  On February 28, 2003, an echocardiographic report showed a normal left ventricle, mitral
valve, left atrium, aortic root, right atrium, and right ventricle.  (Tr. 244).  The aortic valve was

sclerotic and moderately stenotic.  Doppler studies revealed trace aortic insufficiency.  The ejection fraction was 65%.

On May 7, 2003, claimant complained of back pain and left leg numbness.  (Tr. 239).  On June 6, 2003, he denied shortness of breath, and had no edema or angina.  (Tr. 237).  He had no evidence of congestive heart failure.

X-rays dated July 30, 2003, showed mild degenerative disc disease of the lumbar spine with no acute fractures.  (Tr. 396).  Blood and urine tests were normal.  Claimant complained of shoulder and arm pain in August, 2003.  (Tr. 388, 390).  He complained of shoulder and leg pain in September, 2003.  (Tr. 384).

An echocardiographic report dated September, 2003, revealed an ejection fraction of 60% with ventricles, valves and atriums normal.  (Tr. 385).  Chest x-rays dated October 6, 2003, showed no evidence of active cardiopulmonary disease.  (Tr. 381).  An electrocardiographic report dated October 17, 2003, was normal. (Tr. 373).  Claimant presented with back and leg pain on October 18, 2003.  (Tr. 370).  Claimant's PT/INR levels[9] were elevated in the spring of 2004. (Tr. 353-360).  PT level was normal in June, 2004.  (Tr. 345).

On June 16, 2004, claimant was seen by the Orthopedics Department complaining of knee and femur pain with swelling and numbness.  (Tr. 341).  X-rays of the femur showed no evidence of fracture.  (Tr. 342).  Left knee x-rays showed mild degenerative change with no acute bony abnormality.  (Tr. 343).  Right knee x-rays showed some patellar spurring and no evidence of fracture.  (Tr. 344).

---

[9]An increased PT means that your blood is taking too long to clot. *www.labtestsonline.org.*

An MRI of the lumbar spine dated December 20, 2004, appeared to show a minimal component of epidural fibrotic scarring on the right at L5-S1 and moderate central spinal stenosis at L4-5 on a combined basis. (Tr. 319). No herniated discs were seen. On January 25, 2005, claimant complained of pain and numbness radiating down to the left knee, which caused his leg to give out. (Tr. 316). Claimant stated that he had lumbar surgery in 1984. The assessment was chronic low back pain.

**G. Records from UMC dated June 10, 2005 to June 1, 2007.**[10] On June 21, 2005, claimant complained of bilateral leg pain and numbness and requested stronger pain medicine. (Tr. 615-16). Elavil and Mobic were prescribed. (Tr. 616). No chest pain was noted. On July 8, 2005, claimant presented with weakness in both legs and pain. (Tr. 613). Mobic was replaced with Ultram. (Tr. 614). In July and August 2005, no chest pains, bleeding or bruising problems were reported in the Anticoagulant Clinic progress notes. (Tr. 607-612).

On December 21, 2005, claimant presented to Internal Medicine with chest tightness and shortness of breath. (Tr. 601-3). Claimant was seen at least once a month at the Anticoagulant Clinic for follow-up throughout 2006 and 2007, and he sometimes complained of headaches and nosebleeds. (Tr. 549,584,588,592,594). In March 2006, claimant suffered a fall because his "leg gave out." (Tr. 588). In April, 2006, claimant reported a fall which caused him to hit his head and "pass out." (Tr. 585). In May, 2006, claimant reported dizzy spells which caused him to "black out" and fall, especially after walking extended distances. (Tr. 578-9).

An echocardiographic report dated May 4, 2005, revealed an ejection fraction of 55%, and Doppler was normal. (Tr. 574). Holter Monitor testing results on June 29, 2006, showed

---

[10]A number of these records are illegible.

normal sinus rhythm with rates from 48 BPM to 128 BPM, no ventricular ectopic beat noted, and supraventricular ectopic beats consisted of very rare premature beats. (Tr. 556). An echocardiogram on August 1, 2006, showed a normally functioning mechanical prosthetic valve with no significant gradient. (Tr. 550). Abnormal IVS motion consistent with post-operative status was noted, and overall left ventricular systolic function was normal, with an ejection fraction of greater than 55%. Doppler was normal.

On September 20, 2006, claimant had pain in neck, back, and left leg which he rated and "8" on a scale of 1 to 10. (Tr. 542). On May 16, 2007, claimant was seen at the Emergency Room for pain in his ribs. (Tr. 504). He was given a prescription of Tramadol.[11] (Tr. 505).

**H. Consultative Letter from Dr. Murthy Muthuswamy**.[12] The record contains a two-sentence letter from Dr. Muthuswamy of LSU Medical Center dated June 22, 2007. (Tr. 621). After review of claimant's MRI results from December, 2004,[13] the doctor concluded that "there appears to be L5-S1 central stenosis." He further opined that there was no evidence of nerve root impingement and that there was mild central canal stenosis which "may or may not have clinical consequences."

**I. Consultative Report from Dr. Christopher Foti**.[14] Dr. Foti consultatively examined claimant on July 21, 2007, pursuant to this Court's remand order and at the request of the ALJ. (Tr. 623). Upon exam, Dr. Foti found that claimant complained of chronic low back pain. He

---

[11]Brand name is Ultram.

[12]Dr. Muthuswamy's area of specialty, if any, is unclear.

[13]See Dr. Patricia Barnes' MRI report dated December 20, 2004, which references central spinal stenosis and "a minimal component of epidural fibrosis at L5-S1." (Tr. 622).

[14]Dr. Foti's specialty is family medicine. (Tr. 631).

had a slow gait and was able to rise from a sitting position without assistance and stand on his heels and toes. (Tr. 624). Claimant was able to bend and squat with mild difficulty. He had problems tandem walking. His grip strength was 5/5.

Dr. Foti's conclusion was that claimant should be able to sit, but may have difficulty walking and/or standing, for a full work day. (Tr. 625). He further noted that claimant should be able to lift/carry objects up to twenty pounds, but this would place a strain on his already compromised cardiovascular system. Claimant was able to perform most physical exam maneuvers. Claimant had normal range of motion in all joints. (Tr. 626-7). Dr. Foti opined that claimant's previous cardiac surgery would affect his ability to perform work-related functions more so than his chronic back pain. (Tr. 625).

On the Medical Source Statement completed by Dr. Foti on August 7, 2007, it was noted that claimant could lift twenty pounds occasionally, ten pounds frequently, could stand and walk at least two hours in an eight-hour workday, and had no limitations as to sitting. (Tr. 628-9). Claimant could never climb, but he could occasionally balance, kneel, crouch, crawl, and stoop. (Tr. 629). He had no manipulative, visual, or communication limitations whatsoever. (Tr. 629-30).

**J. Records from UMC dated June 1, 2007 to October 30, 2007.** Claimant was seen regularly during this time frame at the Anticoagulant Clinic for routine diagnostic testing and monitoring of his blood. (Tr. 634-723). He occasionally experienced nose bleeds and headaches. On October 30, 2007, he presented at the Internal Medicine clinic with left shoulder pain. (Tr. 636). Claimant's PT/INR levels were elevated during this time period.[15]

---

[15]*See* Tr. 638, 645, 650, 656, 661, 664, 669, 674, 680, 686, 691.

## II.    Testimonial Evidence:  ALJ hearing

At the hearing on November 1, 2007, claimant was 54 years old.  (Tr. 727).  He had a seventh-grade education.  His past relevant work included a convenience store cashier and a security guard.  (Tr. 728-9).  He testified that, as a cashier, he stocked shelves and coolers, bagged ice, and took out the trash.  (Tr. 729).  He worked with a dolly to pull up to ten cases of beer, and each case weighed a few pounds.  ( Tr. 731).  He also performed general maintenance work at the cashier job.  (Tr. 743).  This job was classified by vocational expert Wendy Klamm, who testified at the hearing, as light, semi-skilled, although she noted that on occasion it might go up to medium.  (Tr. 732).

As a security guard, claimant testified that he performed some general maintenance work and also was on his feet walking around the property.  (Tr. 744).  Ms. Klamm testified that security guard is a light, semi-skilled job.  (Tr. 732).

Regarding complaints, claimant testified that his legs got weak, and the left leg became numb after standing too long.  (Tr. 732).  He said that he can only stand about an hour a day, and he cannot walk very far without becoming weak.  He testified that his hands are good, with no discomfort.  He testified that he uses a cane because his Coumadin nurse and doctor told him to, due to the fact that he loses his balance often and has fallen several times and hit his head.[16]  (Tr. 733-34).  He said that when he stoops down, he cannot get up unless he has to grab onto something.

---

[16]The medical record is unclear regarding use of a cane.

Claimant stated that he had back and leg pain every day. (Tr. 745). As to restrictions, claimant testified that he could lift a gallon of milk. (Tr. 746). He stated that he could stand for about 15 to 20 minutes without significantly aggravating his back or getting numbness in his left leg. (Tr. 745-6). He testified that he is never on his feet for more than an hour total in an eight hour day. (Tr. 747). He reported that he had been walking with a cane for about two years. (Tr. 746). He reported that he could sit for about an hour and half, and maybe for two hours total, in a day. (Tr. 747-8). He said that he could walk with his cane for about a block , then rest for 30 to 40 minutes before he could walk back. He has problems getting up when he bends over. (Tr. 747). He testified that the most he can stand in a day is two hours total. (Tr. 750). He also testified that laying flat for too long aggravates his back. (Tr. 753).

Regarding activities, claimant testified that he gets up every day and drinks coffee with a friend who visits him. (Tr. 748). He watched television. He testified that in the afternoons, he walked over and sat in the gazebo where his wife worked, until she got off of work. (Tr. 749). He does not to any chores but does go to the grocery with his wife.

Dr. George Smith (general surgery) testified as a medical expert at the hearing. (Tr. 734). In reviewing the report of consulting physician Dr. Foti, Dr. Smith noted no mention of claimant needing to use a cane. (Tr. 735). Further, Dr. Smith found nothing in Dr. Foti's report regarding claimant's alleged inability to stand for long periods of time. (Tr. 736). Dr. Smith's opinion was that examinations by multiple physicians have not shown any neurological defects.

Regarding the MRI in December, 2004, Dr. Smith opined that while the report noted minimal disc bulge with mild central stenosis, there is no mention of impingement of the thecal sac. Further, the minimal component of epidural fibrosis noted on the right is probably a result

14

of claimant's prior back surgery in 1984, and in any case, claimant's current symptomology is on his right side, not the left.  (Tr. 737).  Thus, Dr. Smith's opinion of claimant's back was that he has degenerative disc changes "without anything more serious going on."

Regarding claimant's heart, Dr. Smith noted that claimant underwent a successful aortic valve replacement in November, 2001, with no complications.  Dr. Smith noted that in February, 2002, claimant's cardiologist released him back to work, but without any heavy lifting.[17]  The echocardiograms have shown good ejection fractions, and so claimant's continued complaints of shortness of breath and fatigue since surgery are unexplainable and contrary to all testing done on his heart.  (Tr. 738).  While claimant takes Coumadin because of his artificial valve, it should not interfere with any of his activities, and he goes to the Anticoagulation Clinic very often to monitor the levels and effectiveness of the medication.  Dr. Smith noted that the valve surgery which claimant had is the most effective surgery of its type currently available, and as such, there are rarely any complications associated with that particular surgery.  (Tr. 739).  He opined that claimant's heart should actually function better post-surgery than it did in the years just prior to the surgery.  (Tr. 740).  In summary, Dr. Smith did not find that claimant's impairments met any of the Listings.  (Tr. 739).

Dr. Smith stated that there are no clinical findings of note other than the one MRI, which showed only mild stenosis.  (Tr. 756).  In closing, Dr. Smith concluded that claimant's degenerative changes are "absolutely minimal."  There are no reports which indicate any compromise in the back, any thecal sac problems, or any moderate to severe degenerative changes.  (Tr. 757, 759).

---

[17]*See* Dr. Jain's note, Tr. 212.

Vocational expert Wendy Klamm testified that claimant's previous jobs as a cashier and security guard were considered light duty. (Tr. 732). The ALJ pointed out that the main concern is figuring out whether claimant can still perform his past relevant work. (Tr. 766-67).

### *Analysis*

Claimant argues that the ALJ erred in assessing his residual functional capacity, resulting in a finding that claimant could perform his past relevant work at step four that was unsupported by substantial evidence. Because I find that the ALJ decision is supported by substantial evidence, I recommend that this case be **AFFIRMED**.

### *Did the ALJ properly weigh the evidence?*

This Court previously remanded claimant's case down to the Appeals Council, which in turn sent the case back to the ALJ to further develop the record, particularly with respect to the MRI of claimant's back from December, 2004, which reportedly showed epidural fibrotic scarring on the right side at L5-S1 and moderate central spinal stenosis at L4-5 on a combined basis. (Tr. 319). The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). Further, the ultimate issue of disability is reserved to the Commissioner. *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). In determining whether the claimant is capable of performing substantial gainful activity, the ALJ used the five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1992).

It is claimant's burden to satisfy the first four steps of the sequential evaluation process, not the Commissioner's. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). In analyzing claimant's impairments, the ALJ found, at step two, that claimant had severe impairments due to

his lumbar spine problems and status-post aortic valve replacement.  (Tr. 449).  At step three, the ALJ found that claimant's impairments did not meet the Listings.  At step four, the ALJ, based on claimant's residual functional capacity, made the determination that claimant could return to his past relevant work as either a cashier or a security guard.  Therefore, the ALJ found the claimant not disabled under the regulations.  (Tr. 453).

The ALJ stated that he fully considered all of the medical evidence in the record for purposes of his decision.  (Tr. 450).  Credibility determinations are generally the province of the ALJ, and his credibility evaluations are entitled to deference.  *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir.1991); *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir.1987).

In determining claimant's residual functional capacity, the ALJ found claimant's assertions regarding his pain to be not entirely credible.  (Tr. 451).  Specifically, the ALJ noted that while claimant alleged severe chronic back pain, he did not exhibit any motor, sensory, neurological, reflex, or circulatory deficits upon clinical examination.  A single MRI report showed degenerative disc disease and a "minimal component" of spinal stenosis, but no nerve root impingement has ever been documented by any of claimant's treating or consultative physicians.  At the hearing, claimant walked with a cane, but there are no medical records showing that claimant was prescribed a cane.

After review of claimant's MRI results from December, 2004,[18]  Dr. Muthuswamy of LSU Medical Center concluded that "there appears to be L5-S1 central stenosis."  (Tr. 621).  He further opined that there was no evidence of nerve root impingement, and that there was mild

---

[18]See Dr. Patricia Barnes' MRI report dated December 20, 2004, which references central spinal stenosis and "a minimal component of epidural fibrosis at L5-S1."  (Tr. 622).

central canal stenosis which "may or may not have clinical consequences." No medical expert in this case has stated that any such "clinical consequences" exist.

Dr. Christopher Foti examined claimant on a one-time, consultative basis at the request of the ALJ on July 21, 2007. (Tr. 623). He found that claimant complained of chronic back pain, but he was able to perform most of the physical exam maneuvers and had normal range of motions in all joints. (Tr. 626-7). Claimant walked with a slow gait and rose from a seated position without assistance. (Tr. 624). He could lift or carry up to 20 pounds occasionally and 10 pounds frequently, and he had no limitations as to sitting. (Tr. 628-9). Dr. Foti found claimant's heart exam to be normal; nonetheless, his opined that claimant's previous cardiac surgery would affect his ability to perform work-related tasks more so than his chronic back pain. (Tr. 625). This finding implies that claimant's chronic back pain will not affect claimant's ability to perform work-related tasks. Dr. Foti cited no medical tests or other objective clinical findings evidencing any limitations of claimant which would affect his daily activities or his ability to work.

Dr. George Smith testified as a medical expert at the ALJ hearing. (Tr. 734). His opinion was that claimant's MRI report referenced mild central stenosis with no mention of impingement on the thecal sac. Further, he opined that the minimal component of epidural fibrosis noted on the right was probably a result of claimant's prior back surgery in 1984, and in any case, claimant's current symptomology was on his right side, not the left. (Tr. 737). Thus, Dr. Smith's opinion of claimant's back was that he has degenerative disc changes "without anything more serious going on."

Claimant's allegation that the ALJ disregarded the opinions of two other consultative physicians is without merit. First, Dr. Durham's opinion that claimant would be precluded from returning to this past work was unsupported by any objective clinical findings, and she did not clarify which of claimant's past employment she was referencing.[19] (Tr. 230). Further, Dr. Durham advised claimant to stay home from work for only ten days, and her sole examination of claimant took place a week before the date he alleges that he became disabled. (Tr. 230, 66).

Second, Dr. Elliott found that claimant had "mild" shortness of breath and slightly limited lumbar spine flexion and straight leg raising. (Tr. 234). Claimant was found to ambulate well, and he got on and off the exam table and out of the chair with no problems. (Tr. 233). Dr. Elliott's diagnosis was mild degenerative joint disease, and he stated that claimant had **no** limitations as to lifting, sitting, standing, or handling objects, and only some limitations of prolonged walking.

In sum, no medical expert has testified that claimant has any nerve root impingement, and there is no evidence in the record to support claimant's assertion that he is suffering from failed back syndrome.[20] Further, there is no evidence in the record that any of claimant's treating physicians at UMC diagnosed him with nerve root impingement or failed back syndrome. His diagnosis was chronic back pain, for which he was treated conservatively with medication over a period of several years. He was never referred to physical therapy, nor was surgery ever

---

[19]Claimant's past work included experience as a roughneck in the oil field, convenience store cashier, and security guard. (Tr. 413, 416).

[20]According to documents attached to claimant's Appeals Council Brief from *Spine-health.com*, epidural fibrosis results in back pain or leg pain because of "binding of the lumbar nerve root by fibrous adhesions." (rec. doc. 8, p. 6; Tr. 402 (*citing www.spine-health.com*)). This condition is commonly called "failed back surgery syndrome." *Id*. However, despite these claims, there is no objective medical evidence in the record which suggests that claimant is suffering from this condition.

recommended. He was never instructed to stay home or to limit his activities in any way. Diagnostic testing has consistently showed normal results.

"There must be clinical or laboratory diagnostic techniques which show the existence of a medical impairment which could reasonably be expected to produce the pain alleged." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir.1990). No such impairment has been shown in this record. Thus, the ALJ found that claimant's functional limitations as to his back were not as severe as he claimed. (Tr., 451). I find that there is substantial evidence in the record to support the ALJ's finding.

Regarding claimant's aortic valve replacement surgery, the medical record reveals that the procedure was a success, and claimant was released back to work with instructions not to do any heavy lifting in February, 2002. (Tr. 212). Claimant has taken Coumadin with no problems, and his routine follow-up monitoring at the Anticoagulant Clinic at UMC found no irregularities with his heart. While claimant complains of frequent shortness of breath, his medical records disclose no condition which would cause these symptoms, other than, possibly, his smoking. Claimant's echocardiograms have been normal, and a Holter monitor in June, 2006, revealed no significant cardiac problems. None of claimant's treating physicians at UMC have indicated that claimant is limited in his activities due to his valve replacement surgery. Thus, the ALJ concluded that claimant's post-valve replacement condition had little measurable effect on his functioning. (Tr. 452). I find that the substantial weight of the medical evidence in the record supports this decision.

After considering all of the evidence, the ALJ found that the claimant had the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally; to

stand and walk two hours at a time, for no more than a total of six hours in an eight-hour day; and to perform frequent stooping, kneeling, bending, squatting, balancing, crouching, crawling, and climbing. (Tr. 452). The ALJ accepted the vocational expert's testimony that claimant's past relevant work as a cashier and security guard were both considered "light duty" jobs. The ALJ concluded that an individual of claimant's age, education, residual functional capacity, and vocational background was able to return to his past relevant jobs of cashier and security guard, as claimant had actually performed those jobs in the past.

Claimant's allegation that the ALJ erred in not utilizing Medical-Vocational Guideline Rule 201.10 to find claimant disabled is without merit. The Fifth Circuit has held that the Guidelines apply only when the ALJ reaches step five and finds that claimant is unable to perform his past relevant work. *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991), *citing Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).[21] Thus, the ALJ's determination that claimant was not disabled at step four precluded the application of the Guidelines in this case.

Considering the foregoing, the undersigned finds that the ALJ's determination that claimant could perform his past, relevant, light duty work as a cashier or security guard is supported by substantial evidence.

### *Conclusion*

The court's function is to determine whether substantial evidence supports the ALJ's decision. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir.1988). Here, the medical evidence supports the ALJ's finding that Louviere retained the

---

[21]*See also* 20 C.F.R. § 404.1520(f); 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 2, § 200.00.

residual functional capacity to perform his past relevant work as a cashier and/or a security guard. Further, the testimony of the vocational expert supports the ALJ's determination that Louviere can perform his past relevant work, and thus, is not disabled. The undersigned finds that substantial evidence in the record supports the ALJ's decision. Accordingly, it is

**RECOMMENDED** that the Commissioner's decision be **AFFIRMED** and the case be **DISMISSED**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(c) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

Signed September 3, 2009, at Lafayette, Louisiana.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE